IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

REBEL DEBUTANTE LLC, a North )
Carolina limited liability )
Company, and ANNA )
STUBBLEFIELD, a/k/a Anna )
Fields, )
)
            Plaintiff, )
)
    v. )        Civil Action No. 1:11cv00113
)
FORSYTHE COSMETIC GROUP, )
LTD., a New York corporation, )
)
            Defendant. )


**MEMORANDUM OPINION AND ORDER
ON MOTION TO TRANSFER AND PRELIMINARY INJUNCTION**

THOMAS D. SCHROEDER, District Judge.

        Before the court is the motion of Plaintiffs Rebel
Debutante LLC ("Rebel Debutante") and Anna Stubblefield, a/k/a
Anna Fields ("Stubblefield") to preliminarily and permanently
enjoin Defendant Forsythe Cosmetic Group, Ltd. ("Forsythe") from
using or displaying the mark "Rebel Debutante," to require
Forsythe to recall, destroy or deliver to the court the
allegedly offending goods using that mark or similar mark, and
for other relief ("Motion").  (Doc. 7.)  Defendant Forsythe
moves to transfer this case to the Southern District of New York
("Motion to Transfer") (Doc. 21), which Plaintiffs oppose (Doc.

24).    Following briefing by the parties and an evidentiary hearing, the matter is ripe for resolution.

## I.    BACKGROUND

Stubblefield, a performer, screenwriter, playwright and author, began publishing her writing on the Internet in 2006 at www.rebeldebutante.com and later on the blogs www.rebeldebutante.blogspot.com and www.annafields.net. (Doc. 8-1, Stubblefield Decl. ¶¶ 2-5.) This writing, presumably beginning in 2006 on www.rebeldebutante.com, introduced her moniker "Rebel Debutante." Stubblefield, in her briefing, describes herself as "the eponymous Rebel Debutante, a woman with a traditional Southern background who was born and raised in North Carolina before moving to Los Angeles to begin a career in the entertainment industry." (Doc. 8 at 2.) She claims to have "coined" the term "Rebel Debutante" "to refer to a personal style and approach to fashion, society and life flowing out of her experiences growing up in, and rebelling against, Southern society." (Id.)

In March 2008, Stubblefield contracted with G.P. Putnam's Sons to author a book entitled "Confessions of a Rebel Debutante." (Doc. 8-1, Stubblefield Decl. ¶ 5.) The book appeared in hardcover on April 15, 2010, and as of the date of Stubblefield's declaration sold over 25,000 copies. A paperback version was released in February 2011. Stubblefield toured

2

nationwide to promote the book and is at work on follow-on books.  (Id. ¶¶ 6-8.)

On October 16, 2008, Stubblefield filed a Trademark/Service Mark Application with the United States Patent and Trademark Office ("USPTO") for the mark "REBEL DEBUTANTE."  Her application and "Trademark/Service Mark Statement of Use" listed "use information" as "clothing, namely, t-shirts, shirts, tank tops, pants, shorts, underwear, hooded sweat shirts, [and] tube tops," and the Statement of Use stated that the mark "is in use in commerce on or in connection with all goods or services listed in the application or Notice of Allowance or as subsequently modified for this specific class."  (Docs. 46-2, 46-3.)  The USPTO issued U.S. Trademark Registration No. 3,703,222 for the trademark "REBEL DEBUTANTE" on October 27, 2009, listing the same "use information" as in the Application.  (Doc. 8-5.)

In December 2008, Stubblefield and a business partner formed Rebel Debutante.  Rebel Debutante is the sole licensee of the "Rebel Debutante" mark.  (Doc. 8-1, Stubblefield Decl. ¶ 9.)  The company offers, as described by Stubblefield, "fashion-oriented products for young women, including tank tops, T-shirts, long-sleeved shirts, jackets, intimate apparel, and jewelry," all sold under the "Rebel Debutante" mark.  According to Stubblefield's declaration, over $10,000 worth of "Rebel

3

Debutante" clothing and merchandise has been sold through the website www.rebeldebutante.com.[1] (Id. ¶¶ 10-11.) Stubblefield states that she intends to expand product sales to retail stores and to offer additional products such as makeup and cosmetics, including nail polish, lipstick, and lip gloss. (Id. ¶¶ 12-14.)

Forsythe is a New York corporation that has manufactured nail polishes since 1979; it sells its products through distributors and "does not typically sell directly to either customers or retailers." (Doc. 20-2, Rose Decl. ¶¶ 3, 11, 14.) Forsythe contends that it first considered using the phrase "Rebel Debutante" in November 2009, and actually began using the name on products "at least as early as January 2010" as part of its Spring 2010 collections of nail polish sold under its registered mark "Color Club." (Id. ¶¶ 6-7; Doc. 45, Rose Decl. ¶ 3; see Doc. 46-1.) The "Color Club" collection name is displayed in advertising, including on the Internet, point-of-sale displays, and packaging. (See Doc. 20-1, Rose Decl. ¶¶ 5-7 (describing "Rebel Debutante" marketing under "Color Club"); Doc. 8-12 (Internet advertisement); 4/29/11 Hearing, Plaintiff's Ex. 2 (point-of-sale display).) Forsythe represents that its "Rebel Debutante" collection was not intended to be a permanent

---

[1] Forsythe challenges the figure of approximately $10,000 in sales, citing documents produced, or the lack of documents produced, by Stubblefield as of the time of Forsythe's response to the Motion "despite Forsythe's request for same." (Doc. 44 at 9 n.4.)

4

collection, has been discontinued, and is no longer offered for sale or advertised. References to the collection or color name "Rebel Debutante" no longer appear on Forsythe's cosmeticgroup.com website. (Doc. 45, Rose Decl. ¶ 4.) Although the collection was known as "Rebel Debutante" and every bottle bore the "Color Club" trademark, only one of the colors in the collection bore the "Rebel Debutante" mark. (Id. ¶ 6.) Forsythe represents it derived $46,745 in profits from sales of the "Color Club" product bearing the "Rebel Debutante" mark. (Id.)

Stubblefield demanded that Forsythe cease and desist from further use of the phrase "Rebel Debutante" by letter dated September 1, 2010. (Doc. 8-16.) Forsythe responded, promising to investigate and "respond shortly." (Doc. 8-17.) However, Forsythe did not respond, and Stubblefield contacted Forsythe again on December 3, 2010. (Doc. 8-18.) Forsythe finally responded on December 13, 2010, and denied any wrongdoing. (See Doc. 8-19.) The last of this correspondence, from Forsythe, appears to have occurred on January 7, 2010, in a letter in which Forsythe's counsel discounted any likelihood of confusion because the goods sold by Forsythe and those in Stubblefield's trademark registration "are not related and they are characterized by the USPTO in different international classes." (Doc. 8-20.)

Stubblefield brought this action on February 10, 2011, claiming that Forsythe infringes and dilutes[2] her "Rebel Debutante" mark through its use on nail polish. (Doc. 1.) The complaint asserts causes of action under the Lanham Act, North Carolina common law, and North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1 et seq. ("UDTPA"). (Doc. 1.) Stubblefield seeks to enjoin Forsythe from any use or display of the "Rebel Debutante" mark, to require Forsythe to recall from the retail market any infringing goods not yet sold to consumers, to mandate that Forysthe destroy all of its materials using the mark and take corrective measures (including notifying Forsythe's distributors of any injunction) to minimize alleged confusion, and to direct Forsythe to file a report setting out actions taken to comply with any injunction. (Doc. 7 at 5-6; Doc. 51 at 3.)

Prior to considering Stubblefield's Motion for injunctive relief, the court turns first to Forsythe's Motion to Transfer the case to the Southern District of New York.

## II. MOTION TO TRANSFER

Forsythe moves to transfer this case to the Southern District of New York pursuant to 28 U.S.C. § 1404(a), arguing that the case is a dispute between two New York parties

---

[2] Stubblefield's briefing before the court focuses on her claim for infringement. Thus, this court will do the same.

involving New York evidence and New York witnesses. (Doc. 21 at 4.) Stubblefield disputes this characterization, noting that Rebel Debutante is a North Carolina corporation based in Winston-Salem, and she testified that she moved to North Carolina in August 2009 and is a full-time law student at Wake Forest Law School in Winston-Salem. (Doc. 24 at 1; Doc. 24-1, Stubblefield Aff., Ex. 5.) Forsythe, in turn, points to media reports quoting Stubblefield as "maintain[ing] significant ties to New York" and to her trademark application listing a New York City address for Rebel Debutante's office to contend that this dispute involves significant contacts in New York. (Doc. 25 at 1.)

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The court undertakes a two-step process in determining whether to transfer a case pursuant to section 1404(a). First, section 1404(a) requires that the lawsuit could have been brought in the district or division to which transfer is sought. Because Stubblefield asserts causes of action under the Lanham Act, which would establish federal jurisdiction generally, and Forsythe is organized under the laws of the State of New York with its offices and manufacturing facilities based

there (Doc. 20-2, Rose Decl. ¶ 3), this action could have been brought in the Southern District of New York.

Second, the court determines whether transfer is warranted. In considering a motion to transfer, a court should weigh the following discretionary factors:

> (1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of law.

Speed Trac Techs., Inc. v. Estes Express Lines, Inc., 567 F. Supp. 2d 799, 802 (M.D.N.C. 2008). The party moving to transfer, in this case Forsythe, bears the burden of proving that the balance favors transfer. Id. at 803. A plaintiff's choice of forum is given considerable weight and, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."[3] Collins v. Straight, Inc., 748 F.2d 916, 921 (4th Cir. 1984) (quoting Gulf

---

[3] A plaintiff's choice of forum, however, receives less weight when (1) the plaintiff chooses a foreign forum, or (2) the cause of action bears little or no relation to the chosen forum. Speed Trac, 567 F. Supp. 2d at 803.

*Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1946)); *Brown v. Flowers*, 297 F. Supp. 2d 846, 850 (M.D.N.C. 2003) (citing *Collins*), *aff'd*, 196 F. App'x 178 (4th Cir. 2006). Transfer is inappropriate if it simply shifts the inconvenience from one party to the other. *Speed Trac*, 567 F. Supp. 2d at 803; *Brown*, 297 F. Supp. 2d at 850. The court's discretion under section 1404(a) with respect to a showing of inconvenience, however, is broader than that available under "the old doctrine of *forum non conveniens*." *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955). Each applicable factor will be addressed in turn.[4]

**Plaintiff's initial forum choice.** Plaintiff Rebel Debutante is a North Carolina limited liability company. Stubblefield grew up in Alamance County, North Carolina, attended high school in Winston-Salem, moved back to Winston-Salem in August 2009, registered to vote in North Carolina on June 23, 2010, and pays taxes in North Carolina. (Doc. 24-1, Stubblefield Aff. ¶¶ 3-4, 6-7, 9-12.) She has produced a rental agreement for property in Winston-Salem beginning August 1, 2009, a schedule of full-time law school classes for Spring 2011, and a copy of a North Carolina driver's license issued to her in 2006. (*Id.*, Exs. 1-4.)

---

[4] The parties agree that the *Speed Trac* factors of jury view and court congestion favor neither venue. (Doc. 22 at 7-8; Doc. 24 at 3-4.)

Forsythe points to Stubblefield's listing of a New York address on her August 26, 2009, trademark statement of use and to evidence that she maintained a presence in New York, including rental of a New York apartment, well into 2010. Forsythe also produced March 2011 printouts of websites maintained by Stubblefield that listed her as a "New York based" television writer, author, comedienne and Reluctant (as well as Rebel) Debutante. (Doc. 22-1, Exs. A-B.) Finally, Forsythe relies on transcripts of April 2010 interviews of Stubblefield in which she stated she spent half the year in New York City and half the year in Winston-Salem (Doc. 25-1, Exs. A-C, E-G; 4/29/11 Hearing), as well as a September 2010 interview transcript in which she is reported to have said that "I'm in Carolina right now but I do go back and forth to New York and LA because I'm writing a movie for the book." (Doc. 25-1, Ex. D.)

At the April 29, 2011 hearing, Stubblefield testified that after moving to North Carolina in 2009, she divided her time between the state and New York primarily to spend weekends with her boyfriend, until he moved to North Carolina in April 2010. She also testified that she had given "hundreds" of interviews and characterized her statements of New York ties as "hyperbole." Finally, she stated that the information on her website blog was simply outdated and, although the New York

lease was in her name, her boyfriend lived there and paid the rent.

While Stubblefield's attempt to dismiss her inconsistent statements as hyperbole does little to enhance her credibility, the materials noted by Forsythe do not fundamentally undermine the fact that North Carolina has a real connection to her claims. Rebel Debutante is a North Carolina company and the licensee of the "Rebel Debutante" mark, and Stubblefield, who owns the mark, has demonstrated a significant connection to the state. Plaintiffs' choice of forum is therefore entitled to considerable weight.

**Relative ease of access to proof sources; availability of compulsory process for attendance of unwilling witnesses and cost of obtaining attendance of willing and unwilling witnesses; relative advantage and obstacles to a fair trial; other practical problems; and local interest in having localized controversies settled at home.** Forsythe argues that these factors favor transfer, primarily on the grounds that the dispute is a "localized controversy" in New York where witnesses reside and discovery will largely take place. (Doc. 22 at 7-8; Doc. 25 at 7-9; Doc. 20-2, Rose Decl. ¶ 3.) Forsythe contends that if forced to litigate outside New York, it will incur significant fees, including retention of local counsel, shipping

11

fees, and costs of travelling with lead counsel. (Doc. 20-2, Rose Decl. ¶ 17.)

It is not apparent that Plaintiffs' Lanham Act claims reflect a localized New York controversy. Forsythe's products are sold nationwide, primarily through distributors. Moreover, Forsythe claims that only a handful of its employees were involved in any relevant way in the matters at issue, and the record indicates that Forsythe relied principally on two consultants in California to identify the "Rebel Debutante" name for its use and to undertake related commercial artwork. (See Doc. 34-5, Rose Decl. ¶¶ 9-10.) Thus, it is not apparent that Forsythe would bear an unfair burden in responding to discovery or that all significant discovery would be limited to New York. Indeed, that Forsythe's employees are located in New York burdens Plaintiffs, who appear willing to accept it. Insofar as Rebel Debutante is closely tied to Stubblefield, located in North Carolina, and has few, if any, employees, any travel burden imposed on Forsythe by the venue appears minimal.

As to the counsel argument, under the oft-applicable "goose/gander" rule, it bears noting that moving the case to New York would cause Plaintiffs to retain local counsel and thereby simply *reverse* the burden of most of the alleged counsel and discovery costs of which Forsythe complains. The remaining factors are neutral.

**Enforceability of judgment.** Forsythe argues that this factor favors transfer because Forsythe is located in New York. (Doc. 22 at 7.) Even assuming for argument's sake any risk of collection attends any possible judgment, Plaintiffs have voluntarily assumed that risk. This factor favors neither party.

**Appropriateness of litigating a diversity case in a forum at home with governing state law.** Forsythe argues that Stubblefield's two North Carolina state law claims favor neither party because they should be dismissed for failing to satisfy the amount in controversy requirement absent the court's supplemental jurisdiction (Doc. 25 at 10.). At this point, the driving force of this litigation appears to be Plaintiffs' Lanham Act claim, and there is no need to address any claim that a New York court is any less-equipped to apply North Carolina law in this case if such claims proceed. This factor therefore favors neither party.

**Avoidance of conflicts of laws problems.** Forsythe argues that this factor favors transfer because New York state law of unfair competition is substantially similar to that of North Carolina. (Doc. 22 at 8.) Plaintiffs respond that they need not address the factor because "there is no anticipated conflict of law issue, and thus the factor does not favor transfer." (Doc. 24 at 5 n.1.) The court agrees with Plaintiffs.

13

In summary, in balancing all the relevant factors the court concludes that Forsythe has not demonstrated that the convenience of the parties and witnesses and the interests of justice weigh in favor of transferring this action to the Southern District of New York. Consequently, Forsythe's Motion to Transfer (Doc. 21) will be denied.

## III. MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION

### A.    Mootness

Forsythe asserts as a preliminary matter that the need for an injunction, preliminary or permanent, is moot because it has discontinued its Rebel Debutante line, no longer markets or sells the product, and does not intend to use the mark in the future. (Doc. 44 at 2-3, 5; Doc. 50 at 2-3; see Doc. 45, Rose Decl. ¶ 4.) Plaintiffs argue that Forsythe's assertions should not be accepted, particularly since it is capable of resuming production. [5]

---

[5] Plaintiffs also argue that Forsythe has "a pattern and practice of willfully or recklessly violating the trademark laws." (Doc. 8 at 28.) Plaintiffs include the dockets relating to two prior cases in which judgments including injunctions against Forsythe were entered. (Docs. 8-8, 8-9.) Forsythe replies that the judgment reflected in Doc. 8-9 was entered into by stipulation and dismissed all damages claims against it. (Doc. 44 at 19-20.) The stipulated judgment itself, submitted by Forsythe, appears to have addressed product packaging while dismissing plaintiff's damages claim and leaving each party to bear its own attorneys' fees and costs of litigation. (See Doc. 46-12.) It is not clear that Forsythe addressed the other case, brought in 2000; the docket reflects that the plaintiff was a cosmetics company and that a settlement appears to have been reached before entry of judgment. (Doc. 8-8.)

14

Once a defendant has stopped marketing a product that allegedly infringes on a protected mark, an injunction may be unnecessary when "there is <u>no</u> reasonable expectation that the wrong will be repeated." <u>Lyons P'ship, L.P. v. Morris Costumes, Inc.</u>, 243 F.3d 789, 800 (4th Cir. 2001) (quoting <u>United States v. W.T. Grant Co.</u>, 345 U.S. 629, 633 (1953)). A defendant, however, "face[s] a heavy burden to establish mootness in such cases because otherwise they would simply be free to 'return to [their] old ways' after the threat of a lawsuit has passed." <u>Id.</u> (quoting <u>Iron Arrow Honor Soc'y v. Heckler</u>, 464 U.S. 67, 72 (1983)). Bald assertions by a defendant that it will not start up again are not enough to carry this heavy burden. "In the context of an infringement action, such assertions, standing alone, cannot eliminate the plaintiff's 'reasonable expectation that the alleged violation will recur' in the absence of a court order." <u>Id.</u> at 800-01 (remanding with instructions that district court enter an injunction).

Even when a defendant has ceased production, it has not met its "heavy burden" unless it shows that it would be unable to resume production in the future. <u>Lance Mfg., LLC v. Voortman Cookies Ltd.</u>, 617 F. Supp. 2d 424 (W.D.N.C. 2009) (granting preliminary injunction; also expressing concern about products still in the marketplace); <u>cf.</u> <u>Lorillard Tobacco Co. v. S & M Brands, Inc.</u>, 616 F. Supp. 2d 581, 586 (E.D. Va. 2009) (noting

15

that defendant continued to challenge whether the mark was infringed and granting preliminary injunction on initial advertisements).

The court concludes that Forsythe's mere assurance that the case is moot does not eliminate Plaintiffs' reasonable expectation of a further violation. This is buttressed by Forsythe's assertion throughout that its use does not infringe the mark. The court finds, therefore, that Forsythe has not met its "heavy burden," and neither the case nor the motion for injunctive relief is moot.

**B. Standard for Injunctive Relief**

A preliminary injunction is "an extraordinary remedy . . . which is to be applied only in [the] limited circumstances which clearly demand it." Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991) (internal quotation marks omitted) (citation omitted). The traditional purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003). Before a court may enter a preliminary injunction, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

16

preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave, 553 F.3d 292, 298 (4th Cir. 2009) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008)). The burden is on the party seeking a preliminary injunction to demonstrate by a "clear showing" that she is entitled to such relief. See, e.g., The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 345-46 (4th Cir. 2009) (citing Winter, 555 U.S. 7, 129 S. Ct. at 375-76, with respect to likelihood of success on the merits at trial and irreparable injury), vacated on other grounds, 130 S. Ct. 2371 (2010), restated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam). Each requirement will be examined in turn.

### 1. Likelihood of Success on the Merits

To prove trademark infringement, Stubblefield must show that she owns a valid and protectable mark, Forsythe used a "reproduction, counterfeit, copy, or colorable imitation" of that mark in commerce and without Stubblefield's consent, and use of the mark is likely to cause confusion. Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 259 (4th Cir. 2007). To obtain a preliminary injunction, Stubblefield must show a likelihood of success with respect to each of these elements. See Lorillard, 616 F. Supp. 2d at 590.

17

### a. Ownership of a Valid and Protectable Mark

Stubblefield applied with the USPTO for registration of "Rebel Debutante" on October 16, 2008. USPTO issued a registration certificate on October 27, 2009.

To ascertain whether a trademark is protected, the court must determine whether the mark is (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. U.S. Search, LLC v. US Search.com Inc., 300 F.3d 517, 523 (4th Cir. 2002). Suggestive as well as arbitrary and fanciful marks are deemed inherently distinctive and receive the greatest amount of protection. Id. A suggestive mark consists of words that connote, rather than describe, some quality or characteristic of a product or service. A descriptive mark may be eligible for protection but only if it has acquired a "secondary meaning" in the minds of the public. Terms that are generic are ineligible for protection. Id.[6]

A certificate of registration is *prima facie* evidence of the validity of the mark, ownership by the registrant, and proper registration under the Lanham Act. Brittingham v. Jenkins, 914 F.2d 447, 452 (4th Cir. 1990) (citing 15 U.S.C.

---

[6] Examples of suggestive marks (which conjure images of associated products) include Coppertone®, Orange Crush®, and Playboy®. Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464 (4th Cir. 1996). Examples of fanciful marks (made-up words expressly coined to serve as a mark) include Clorox®, Kodak®, Polaroid®, and Exxon®. Arbitrary marks (common words applied in unfamiliar ways) include Camel® cigarettes and Apple® computers. Id.; U.S. Search, 300 F.3d at 523 & n.6.

§ 1057(b)); see 15 U.S.C. § 1115(a). Because the USPTO did not require Stubblefield to establish a "secondary meaning" before it granted registration, the USPTO did not consider the mark either generic or merely descriptive, which would not be protected. Rather, in this case, the grant of the registration is *prima facie* evidence that the mark is suggestive (or fanciful or arbitrary). See Synergistic Int'l, LLC v. Korman, 470 F.3d 162, 172 (4th Cir. 2006); Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 934 (4th Cir. 1995). Further, the "Rebel Debutante" mark is entitled to a presumption of validity and Stubblefield of ownership. 15 U.S.C. § 1115(a); see Brittingham, 914 F.2d at 452 (citing 15 U.S.C. § 1115(a)). Because "Rebel Debutante" has not been in continuous use for five consecutive years following registration, registration is not "conclusive" evidence and therefore not incontestable by Forsythe under the Lanham Act. See 15 U.S.C. §§ 1115(b) ("Incontestability"), 1065 ("Incontestability of right to sue mark under certain conditions"); cf. Korman, 470 F.3d at 166 (citing 15 U.S.C. § 1065 in context of mark satisfying incontestability requirements).

Forsythe contests the validity of Stubblefield's registration in its counterclaims and by affirmative defense. (Doc. 40 at 10, 13-17; see Docs. 44 at 3 n.1, 46-3, 46-4, 46-5, 46-6.) The presumption of validity does not preclude one

charged with infringement from collaterally attacking the trademark either by way of an affirmative defense or by way of a counterclaim seeking cancellation of the registration if the mark has not become incontestable under § 1065. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1529 (4th Cir. 1984) (citing 15 U.S.C. § 1115(a)). In challenging the presumption, Forsythe must introduce sufficient evidence, by a preponderance, to rebut the presumption of Stubblefield's right to exclusive use. *Id.* at 1529 & n.4.

Forsythe, which has produced little evidence in support of its challenge at this time, has not carried its burden of introducing sufficient evidence to rebut the presumption. Further, the term "Rebel Debutante" on its face appears suggestive, juxtaposing two words not typically associated with one another, that is, the formal, reserved debutante with rebelliousness. Therefore, the court concludes that Stubblefield has demonstrated a likelihood of success on this element.

### b. Use of Mark in Commerce and Without Consent

Stubblefield presented evidence of Forsythe's use of the mark "Rebel Debutante" in commerce, consisting primarily of Forsythe's own advertisements and product displays using the term "Rebel Debutante" in connection with the sale of nail polish. (*E.g.*, Doc. 8-12; 4/29/11 Hearing, Plaintiff's Exs. 1-

20

2.)  Stubblefield also presented evidence, including letters between the parties prior to litigation, demonstrating that Stubblefield did not consent to use of the mark by Forsythe. (E.g., Docs. 8-16 through 8-20.)  Therefore, Stubblefield has demonstrated a likelihood of success on this element.

### c. Defendant's Use of Mark in a Manner Likely to Cause Confusion

Stubblefield must show that Forsythe's use of the mark occurred in a manner likely to cause confusion.  At the preliminary injunction stage, however, a plaintiff need only show he or she is likely to show a likelihood of confusion with respect to this element.  See WCVB-TV v. Boston Athletic Ass'n, 926 F.2d 42, 44 (1st Cir. 1991) ("Unless a plaintiff can convince a district court that it will likely show such a 'likelihood of confusion' on the merits of its trademark claim . . . it is not entitled to a preliminary injunction.").  "The test is *likelihood* of confusion; evidence of actual confusion is unnecessary."  Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 463 (4th Cir. 1996); see Louis Vuitton, 507 F.3d at 263 (noting that it is "well established that no actual confusion is required to prove a case of trademark infringement").

To ascertain the likelihood of confusion between two trademarks, courts consider a number of factors, including the following: (1) the strength or distinctiveness of plaintiff's

21

mark; (2) the similarity of the two marks; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the parties in conducting their businesses; (5) the similarity of the advertising used by the parties; (6) the defendant's intent in using the same or similar mark; (7) actual confusion; (8) the proximity of the products as they are actually sold; (9) the probability that the senior mark owner will "bridge the gap" by entering the defendant's market; (10) the quality of the defendant's product in relation to the mark owner's product; and (11) the sophistication of the consuming public. <u>Shakespeare Co. v. Silstar Corp. of Am., Inc.</u>, 110 F.3d 234, 241-42 (4th Cir. 1997); <u>Sara Lee</u>, 81 F.3d at 463-64; <u>Pizzeria Uno</u>, 747 F.2d at 1527. This list "is neither exhaustive nor exclusive, and some of the factors may not always be relevant or equally emphasized in each case." <u>Shakespeare</u>, 110 F.3d at 242; <u>see</u> <u>Sara Lee</u>, 81 F.3d at 463 (noting that "though several factors are simultaneously present, some factors may, depending on the case, be more important than others"). Each factor will be considered in turn.

**Strength or Distinctiveness of Plaintiff's Mark.** "The first and paramount factor" is the distinctiveness or strength of the mark. <u>Pizzeria Uno</u>, 747 F.2d at 1527. Forsythe asserts that Stubblefield's mark is neither strong nor distinctive, its

22

use in the marketplace being allegedly weak (generating less than $10,000 in sales despite Stubblefield's claim to the contrary). (E.g. Doc. 44 at 9 n.4; see Doc. 50 at 5.) Forsythe also asserts that the mark is descriptive and, therefore, not entitled to protection. (Doc. 44 at 10.)

In assessing this factor, the court examines "the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace." CareFirst of Md., Inc. v. First Care, P.C., 434 F.3d 263, 269, 271 (4th Cir. 2006); accord Ga. Pac. Consumer Prods., LP v. Von Drehle Corp., 618 F.3d 441, 454 (4th Cir. 2010) (citing George & Co., infra); George & Co. LLC v. Imagination Entm't Ltd., 573 F.3d 383, 393 (4th Cir. 2009) (citing Pizzeria Uno). As the Fourth Circuit has observed, "[i]n conducting the likelihood-of-confusion analysis, a court does not 'indulge in a prolonged and minute comparison of the conflicting marks in the peace and quiet of judicial chambers, for this is not the context in which purchasers are faced with the marks.' Rather, we look to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." CareFirst, 434 F.3d at 267 (citation omitted) (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:58 (4th ed. 2005)).

23

The "strength" of a mark is the "degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source." Id. at 269. The strength is evaluated in terms of the mark's "conceptual strength and commercial strength." Id. Measuring the mark's conceptual (or inherent) strength focuses on the linguistic or graphical peculiarity of the mark. Id. As noted, courts have classified marks into four groups in an ascending order of strength or distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. Pizzeria Uno, 747 F.2d at 1527. This factor obviously relates to validity of the trademark itself as well.

As this court concluded, the term "Rebel Debutante" is more aptly classified as suggestive than descriptive. The juxtaposition of the words implies a distinctive concept of a woman both a part of, and rebelling against, the establishment. The term, therefore, appears to have significant linguistic strength.

The commercial-strength inquiry "looks at the marketplace and asks 'if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or enterprise.'" CareFirst, 434 F.3d at 269. Stubblefield, at the time of the commencement of this lawsuit, claims to have sold

24

over $10,000 in merchandise related to the "Rebel Debutante" mark through a website. The record also indicates that over 25,000 consumers have purchased "Confessions of a Rebel Debutante" (after the appearance of Forsythe's "Rebel Debutante" collection) and that the publication contract for the book arose as a result of Stubblefield's website. Although her book was placed on the market after introduction of the collection, those sales and an earlier book contract suggest that in some measure the term "Rebel Debutante" would be considered closely associated with Stubblefield by a segment of the consuming public. Accordingly, this factor weighs in favor of Stubblefield.

**Similarity of the Two Marks to Consumers.** Forsythe argues that the combined use of its Color Club "house mark" (which it asserts has been a recognized brand name since 2003 (Doc. 45, Rose Decl. ¶ 3; Doc. 46-1 (Certificate of U.S. Trademark Reg. for "Color Club")) with the term "Rebel Debutante" negates any likelihood of confusion. Forsythe relies principally on CareFirst, 434 F.3d at 271, which Forsythe describes as finding that "'CareFirst BlueCross BlueShield' [is] not likely to be confused with 'FirstCare' [sic]," and Four Seasons Hotels Ltd. v. Koury Corp., 776 F. Supp. 240, 247 (E.D.N.C. 1991), which Forsythe describes as holding that "'Holiday-Inn Four Seasons' for [a] Greensboro hotel [is] not likely to cause confusion with

25

the 'Four Seasons' national hotel brand." (Doc. 44 at 11-12; Doc. 50 at 4-5.) Forsythe also argues that "Color Club" is displayed prominently in connection with its use of the phrase "Rebel Debutante" and that it is impossible to confuse Forsythe's "stylistic, classy script" on Color Club nail polish collections with Stubblefield's block-printed, angled use on clothing. (Doc. 44 at 12 (comparing Doc. 8-12 with Doc. 8-21).)

Stubblefield contends that the two marks are identical (because they contain "Rebel Debutante") and that customers are unlikely to believe that the pairing is associated with different companies' products, citing <u>United States Jaycees v. Philadelphia Jaycees</u>, 639 F.2d 134, 142 (3d Cir. 1981) ("great likelihood of confusion when an infringer uses the exact trademark"). In other words, Stubblefield argues, pairing "Rebel Debutante" with "Color Club" aggravates the likelihood of confusion because it could lead consumers to believe that the "Rebel Debutante" mark belonged to Forsythe, not Stubblefield.

Neither <u>CareFirst</u> nor <u>Four Seasons</u> suffices to carry the day for Forsythe. In <u>CareFirst</u>, the court determined on summary judgment that a Virginia primary care physician group's use of the name "First Care" was not likely to cause confusion with plaintiff's "CareFirst" mark used predominantly as "CareFirst Blue Cross Blue Shield." After noting that plaintiff was aware of defendant's use for over eight years before suing, the court

26

conducted its likelihood of confusion analysis and found it important that no actual confusion could be shown over that extended period. Noting (which Forsythe emphasizes here) that "[i]f one of two similar marks is commonly paired with other material, that pairing will serve to lessen any confusion that might otherwise be caused by the textual similarity between the two marks," the court stated that this "is most significant when . . . the allegedly infringed mark . . . has little independent strength." 434 F.3d at 271. The court found the "CareFirst" mark weak with little conceptual strength upon evidence that "dozens" of healthcare-related businesses used "CareFirst" or "First Care." Id. at 269-70. The court concluded that "[b]ecause CareFirst's registered mark is weak, consumers encountering 'CareFirst BlueCross BlueShield,' on the one hand, and 'First Care' on the other, are more likely to focus on the differences between the two" particularly in light of the prominence of the "Blue Cross Blue Shield" mark. Id. at 271.

Any support CareFirst might provide Forsythe is not well-developed on this record. The mark "Rebel Debutante," unlike the weak CareFirst mark, is peculiar and possesses independent conceptual strength. No one is shown to use the "Rebel Debutante" mark other than Stubblefield, who appears to have coined the phrase, and, for a time, Forsythe. Moreover, "CareFirst" and "First Care" are only similar, whereas "Rebel

27

Debutante" is identical.  Unlike in CareFirst, the court cannot say on this record that the parties' use of the mark is sufficiently different to reduce the likelihood of confusion. It is also important that CareFirst was decided on a full factual record on summary judgment, yet in this case discovery has only just begun.

Four Seasons involved a challenge by the owner of the "Four Seasons" hotel mark against the operator of a "Holiday Inn" hotel in Greensboro, North Carolina.  The defendant used the "Four Seasons" name in advertising because the hotel was located at Four Seasons Town Centre Mall.  The court found that the defendant's use of "Four Seasons" by itself infringed on the plaintiff's protected marks.  776 F. Supp. at 248.  Most of the remainder of the court's discussion concerned the defendant's attempt to establish a prior use defense.  It was in that context that the court recognized that "[u]se of a strong, well-known mark as part of a composite name reduces the likelihood that the remainder of that composite name will create a commercial impression distinct from the well-known mark."  Id. at 247.  The court quickly noted, however, that "Holiday Inn" is "one of the strongest, most well-known service marks in the American hotel industry."  Id.  Here, Forsythe has not made this showing as to "Color Club."  More to the point, the court ultimately permitted the defendant to use "Four Seasons" in

28

conjunction with "Holiday Inn" as a location modifier and in conjunction with other specific "nationally recognized hotel-chain names" specifically because the mark owner conceded such use, thus relieving the court of the need to decide the question. Id. at 248.[7] In contrast, "Rebel Debutante" invokes a peculiar lifestyle unlike the geographic descriptor in Four Seasons, and Plaintiffs do not concede Forsythe's use. And here, too, Four Seasons was decided after a full trial, whereas the matter before the court is merely at the preliminary injunction stage.

Although pairings may decrease or eliminate the likelihood of confusion in some cases, simply pairing a registered trademark with another mark cannot alone avoid a finding of a likelihood of confusion. See Super Duper, Inc. v. Mattel, Inc., 382 F. App'x 308, 316 (4th Cir. 2010) (unpublished per curiam) (approving jury instruction that placement of house mark on packaging did not ipso facto foreclose the possibility that a likelihood of confusion existed; citing CareFirst), cert.

---

[7]  A leading treatise on trademarks, in citing CareFirst, Four Seasons, and other cases, observed that "the most that can be said as a generalization is that a junior user's addition of a house mark to a possibly infringing mark of the senior user has the potential to reduce or eliminate likelihood of confusion." 4 Thomas J. McCarthy, McCarthy on Trademarks and Unfair Competition § 23:43 (4th ed.) (emphases added) (but noting examples of a likelihood of confusion created when a junior user added its house mark to the senior user's mark, including NU-LOOK laundry detergent versus KNIGHT'S NU-LOOK on floor polish; SPARKS for shoes versus SPARKS BY SASSAFRAS for women's apparel; and GOLF CLASSIC men's hats versus HATHAWAY GOLF CLASSIC sports shirts).

denied, 131 S. Ct. 1003 (2011).[8] The court finds that pairing of the "Rebel Debutante" mark with "Color Club" does not avoid but may increase potential confusion. For example, Plaintiff's Exhibit 1 presented at the April 29, 2011, hearing presents a Forsythe advertisement in which the term "Rebel Debutante" appears above, centered, and in much larger type than "Color Club." This advertisement could lead to confusion by making it appear that "Color Club" was being paired with "Rebel Debutante." Cf. Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc., 875 F. Supp. 966, 978 (E.D.N.Y. 1994) (finding likelihood of confusion with "Boar's Head" mark of meat producer where "Boar's Head Beer" was paired with the latter's "Weinhard" trade name); Express Welding, Inc. v. Superior Trailers, LLC, 700 F. Supp. 2d 789, 798-99 (E.D. Mich. 2010) (finding that defendant's use of its trade name "Superior Trailers" in connection with plaintiff's "Nitro Stinger" and "Nitro Spreader" marks did not reduce the likelihood of confusion). And while Forsythe argues that it employs cursive script in part (e.g., "*Rebel* Debutante" (4/29/11 Hearing, Plaintiff's Exs. 1, 2; Doc. 8-12)), this slight variation is not sufficient to avoid potential confusion. Therefore, this factor favors Stubblefield.

---

[8] Unpublished decisions are not precedential but are cited for their persuasive authority.

**Similarity of the Goods or Services.** Stubblefield argues that her market consists of young women who are fashion-conscious and are heavy consumers of apparel and accessories (such as nail polish). She contends that both parties sell components of an image, in this case the "Rebel Debutante" image. (Doc. 8 at 22-24.) Forsythe argues that the products are completely different. (Doc. 44 at 13.)

A mark holder is not limited to protection of only the products listed in its application to USPTO or by the resulting certificate of registration. Suggestive marks are entitled to more protection than just those products sold, and the appropriate reading "is not limited to the text of the mark's registered purpose." <u>Synergistic</u>, 470 F.3d at 172-73. The question is whether the goods or services are related. <u>See</u> <u>id.</u> at 173 (citing <u>Pizzeria Uno</u>, 747 F.2d at 1527).

Cosmetics are, to some degree, related to women's apparel. Apparel has been identified as related to other products, including cosmetics, generally in cases involving a well-known mark or involving identical marks. <u>In re Jacques Bernier Inc.</u>, 1 U.S.P.Q.2d 1924, 1925, 1987 WL 123809 (T.T.A.B. 1987)[9]; <u>see In</u>

---

[9] The Fourth Circuit has noted that Trademark Trial and Appeal Board ("TTAB") decisions are due "great weight" when they bear on an issue but that great weight "does not mean obeisance, and it does not even mean deference, particularly in the face of overwhelmingly clear statutory language that leads to a contrary conclusion." <u>Int'l</u> <u>Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a</u> <u>Monaco</u>, 329 F.3d 359, 379 (4th Cir. 2003). In the present context,

31

re Barbizon Int'l, Inc., 217 U.S.P.Q. 735, 737, 1983 WL 51785
(T.T.A.B. 1983) (noting "a substantial body of case precedent
holding, . . . by virtue of a perceived intimate relationship
between cosmetics and clothing in the women's fashion arena . .
. that such goods are highly related and would, when sold under
identical or highly similar marks, evoke impressions of common
origin (or at least confusion with respect thereto)," and
finding such judgments as to relatedness to be "sound" (citing
cases)); In re Arthur Holland, Inc., 192 U.S.P.Q. 494, 1976 WL
21149 (T.T.A.B. 1976) ("It has been held repeatedly that the use
of the identical trademarks for clothing and for a toilet
preparation or cosmetic is likely to cause confusion, mistake or
deception."). There is, however, "no per se rule that there is
a likelihood of confusion when the same or similar mark is
applied to clothing and to toiletry or cosmetic products; each
case must be resolved on its own facts." Fruit of the Loom,
Inc. v. Fruit of the Earth, Inc., 846 F.2d 78, 1988 WL 26058, at
*1 (Fed. Cir. 1988) (unpublished table opinion) (citing In re
Jacques Bernier Inc.) (observing, in a case not involving
identical marks, that the TTAB noted that the link between
cosmetics and clothing marketing is important mainly for high-

however, published opinions of the TTAB certainly can provide
guidance.

fashion marks that usually involve the names of well-known designers).

The court finds that, on balance, this factor favors Stubblefield.

**Similarity of Facilities Employed, and Advertising Used, by Mark Holders.** Because of the overlap of factual considerations with respect to the similarity of facilities and advertising in this case, the court will consider these factors together.

Stubblefield argues that she advertises over the Internet and that an Internet search using the term "Rebel Debutante" produces a search result in which advertisements for Forsythe's "Rebel Debutante" collection appear immediately before and after her advertisements. (Doc. 8 at 8; see Doc. 8-13.) She also has an Internet blog and argues that Forsythe's Internet blog devoted to its nail polish products targets the same demographic market as hers. (Doc. 8 at 8, 26-27; see Docs. 8-14, 8-15.) Forsythe, however, asserts that its products are sold in a completely different manner and to different types of women than Stubblefield's current products. (Doc. 44 at 16.)

That both the Plaintiffs (nearly exclusively) and Forsythe (as part of a larger advertising approach) employ the Internet to market their products, as do probably the majority of sellers today, does not resolve whether the products are targeted to the same market. For those customers desiring a "Rebel Debutante"

33

product because of the mark, it is relevant that an Internet search for "Rebel Debutante" calls up Forsythe's as well as Plaintiffs' products and websites (Doc. 8 at 8; <u>see</u> Doc. 8-13), but it otherwise does little to answer whether the parties employ the same advertising. Apart from the Internet, Stubblefield and Forsythe appear to employ very different facilities and advertising approaches. Thus, these factors favor Forsythe.

**Defendant's Intent.** This factor looks to the intent of a defendant in adopting the mark. The intent factor sometimes is a "major" factor because "[i]f there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." <u>George & Co.</u>, 575 F.3d at 397 (quoting <u>Pizzeria Uno</u>, 747 F.2d at 1535).

Stubblefield asserts that infringement was deliberate,[10] as Forsythe used "the exact same mark to sell its products to the exact same customers months after it was constructively notified of Plaintiff's registration; facts which suggest intent." (Doc. 8 at 27.) Stubblefield argues that Forsythe's failure to check

---

[10] Stubblefield also points to the two prior actions against Forsythe for trademark infringement. <u>See</u> note 5 <u>supra</u>.

registered trademarks makes injunctive relief all the more appropriate. (Id. at 27-28; see also Doc. 43 at 2-6.)

Forsythe's President asserts that she had never heard of Stubblefield, her book, her company or the Rebel Debutante mark prior to receiving Plaintiffs' cease and desist letter. Forsythe contends, and the evidence tends to show, that it contracted with an independent creative consultant, who created a list of potential product names, including "Rebel Debutante," from which Forsythe made selections. The Color Club line "Rebel Debutante," Forsythe states, came out in January 2010 and included one specific color of polish. (Doc. 20-2, Rose Decl. ¶¶ 6-7, 10; Doc. 34-5, Rose Decl. ¶¶ 3, 9-10.) At this early stage, there has been no indication whether Forsythe was made aware of either the source of the consultant's "Rebel Debutante" recommendation or whether the consultant conducted a trademark search.

Though Stubblefield's use of the "Rebel Debutante" mark predated Forsythe's use by a few years, by late 2008 her use of it on clothing appears to have been quite limited. While the uniqueness of the mark would make it highly coincidental that it was originated independently, for purposes of Stubblefield's Motion there is no evidence that Forsythe knew of it or Stubblefield or intended to use the mark to confuse the public.

35

Moreover, Forsythe's failure to undertake a search of the mark[11] "shows carelessness at most." *George & Co.*, 575 F.3d at 398; *see* *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 697 (E.D. Va. 2005); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed.) (noting that every trademark registration is constructive notice to all of the registrant's rights but "the existence of constructive notice is not evidence that a later user necessarily intended to confuse").

On this record, therefore, the court will make no finding of what Stubblefield may later show regarding Forsythe's intent. At present, this factor is neutral.

**Actual Confusion.** Stubblefield does not present evidence of actual confusion but argues that the importance of actual confusion is greatly reduced when a defendant uses a plaintiff's identical mark. She represents that she intends to show actual confusion as the case proceeds but reminds that the purpose of a preliminary injunction is to preclude actual confusion from occurring in the first place. (Doc. 8 at 28-29; Doc. 49 at 4-5.) Forsythe asserts that this factor weighs heavily against a preliminary injunction because Stubblefield has offered "zero

---

[11] The records of the USPTO may be searched electronically, at least in part. *See* *Music Makers Holdings, LLC v. Sarro*, No. 09cv1836, 2010 WL 2807805, at *2 n. 1 (D. Md. July 15, 2010) (courts may take judicial notice of matters of public record from sources such as the USPTO electronic search system).

evidence" of confusion, by survey or otherwise. (Doc. 44 at 17.) Forsythe's President states that, based on her discussions with her office workers, "no customer has ever contacted Forsythe in the mistaken belief that Forsythe was either affiliated with, related to, or sponsored by Plaintiffs." (Doc. 34-5, Rose Decl. ¶ 3.)

Stubblefield is not required to show actual, but only likelihood of, confusion. Sara Lee, 81 F.3d at 463 ("[E]vidence of actual confusion is unnecessary."); Lone Star, 43 F.3d at 933. To be sure, though actual confusion is not required, "evidence of actual confusion is 'often paramount' in the likelihood of confusion analysis." George & Co., 575 F.3d at 393 & 398. However, there is no evidence of actual confusion among the consuming public here, and this factor favors Forsythe.

**Proximity of Products as Actually Sold.** Stubblefield, while acknowledging "some differences" in the parties' sales outlets, advertising, and trade channels, asserts there is significant overlap as both parties advertise and sell online and "promote their products in magazines targeting the same fashion-conscious young women." (Doc. 8 at 29-30.) Stubblefield is careful to use the phrase "promote" rather than "advertise," as she has offered only interviews she gave that *appeared in* magazines rather than actual advertisements. (See

37

Doc. 8 at 3 (referencing interviews "published in magazines and newspapers nationwide," citing Ex. 3 as an example); Doc. 8-3 (Ex. 3 to Doc. 8 (online article)).) Forsythe argues that the vast majority of Stubblefield's direct sales appear to have been conducted by her personally at The Heavy Rebel Weekender, a music festival that included mud wrestling, the "Most Beer in 60 Seconds" drinking contest, and the "Wet Wife-Beater" wet t-shirt contest. (Doc. 44 at 4, 14-15; Docs. 46-7, 46-10.) Forsythe concludes that "one can hardly imagine a more dissimilar environment where the parties' goods are sold" and that there would be no chance that consumers would believe that viewing Stubblefield's mark on t-shirts and other items of clothing "sold at raunchy events would be associated with Defendant's nail polish sold in professional nail salons." (Doc. 44 at 15.)

This factor looks to the proximity of products as actually sold. The products do not appear in proximity except as sold through Internet advertising.[12] This factor therefore favors Forsythe.

---

[12] Forsythe does not specifically challenge the geographic scope of Plaintiffs' use of the mark or argue how, if at all, this factor should affect the entry of any injunction. (Cf. Doc. 50 at 5 (arguing only that the parties use "drastically different trade channels").) Under the Lanham Act, registration constitutes constructive notice of use and confers a right of priority "nationwide in effect." See 15 U.S.C. §§ 1057(c), 1072. In Dawn Donut Company v. Hart's Food Stores, Inc., 267 F.2d 358 (2d Cir. 1959), however, the court set forth a per se rule that there could never be any likelihood of confusion (and thus any injunction would be inappropriate) so long as the parties operate in separate and distinct geographic markets. The Fourth

**Likelihood that the Senior Mark Holder will "Bridge the Gap" by Entering Defendant's Market.** Stubblefield's application for registration, and the related registration, of her mark covers items of clothing but does not list nail polish. (Docs. 8-5, 46-2; see Doc. 8 at 30-32.) She asserts, however, that she intends to expand product sales to retail stores and to offer additional products such as makeup and cosmetics, including nail polish, lipstick, and lip gloss. (Doc. 8-1, Stubblefield Decl. ¶¶ 12-14.)

The "gap" between apparel and cosmetics is not great. The parties disagree as to the ease in which an entity can enter the nail polish market as well as the veracity of Stubblefield's claimed intent to do so. Stubblefield asserts that there is a high probability that she will bridge the gap into the nail polish business, citing current negotiations with a Winston-Salem store to sell items including nail polish as well as her

Circuit has applied this "Dawn Donut Rule." See Lone Star, 43 F.3d at 932 (noting that under the Lanham Act a competing user may use the mark in territories not served by the mark holder until the holder expands its business there). However, the rule has been questioned as based on outdated factors, see Circuit City Stores, Inc. v. CarMax, Inc., 165 F.3d 1047, 1056-57 (6th Cir. 1999) (Jones, J. concurring) (questioning whether the Dawn Donut Rule has outlived its usefulness given recent technology, including the Internet), and in some cases deemed inappropriate where the businesses transcend local boundaries such as through use of the Internet, see A.Z. Johnson, Jr., Inc. v. Sosebee, 397 F. Supp. 2d 706, 710 n.1 (D.S.C. 2005) (dicta). Here, Plaintiffs registered and used the "Rebel Debutante" mark first, have publicized it nationwide, and have used the Internet to seek and obtain sales nationwide. On these facts at this very preliminary stage, the court finds this showing sufficient for entry of the injunction. To be sure, any permanent relief will require a more detailed showing.

receipt of an e-mail inquiry from a potential customer whether she manufactured the nail polish worn by a model shown in connection with her mark. (Id. ¶¶ 12-14 (Stubblefield's stated intent); Doc. 8-22 (e-mail).) Stubblefield also asserts that market entry is relatively inexpensive because the product is available from manufacturers and is inexpensive to brand. (Doc. 8 at 31.)

Forsythe counters by pointing out that Stubblefield is a full-time law student (see Doc. 24-1, Stubblefield Aff. ¶ 3 & Ex. 2) who would have a difficult time expanding into the nail polish business while "studying to pass the bar." Forsythe also observes that Stubblefield has offered no business plan or documentary evidence demonstrating the alleged planned expansion into nail products, which Forsythe says has a high barrier to entry (including compliance with Food and Drug Administration and Environmental Protection Agency regulations). (Doc. 44 at 15.) Therefore, it contends, it is highly unlikely that Stubblefield, who offers non-brand name apparel items such as "t-shirts, thongs, and shorts," would be expected to expand into cosmetics products, including nail care. (Id. at 15; Doc. 45, Rose Decl. ¶ 8.)

"This factor inquires into whether a plaintiff is likely to enter defendant's market, or 'bridge the gap.' It recognizes the senior user's interest in preserving avenues of expansion

40

and entering into related fields." <u>Morningside Grp. Ltd. v.</u>
<u>Morningside Capital Grp., L.L.C.</u>, 182 F.3d 133, 141 (2d Cir.
1999) (internal quotation marks omitted). This factor may be
particularly relevant when the goods are dissimilar, and a
plaintiff who is likely to bridge the gap may be able to assert
its trademark rights over another as to a product that is
unrelated to the plaintiff's product. <u>U.S. Hosiery Corp. v. The</u>
<u>Gap, Inc.</u>, 707 F. Supp. 800, 813 (W.D.N.C. 1989) (stating on
summary judgment that "when the goods are dissimilar, courts
will often also consider whether plaintiff is likely to 'bridge
the gap' between the plaintiff's type of product and the type of
product offered by defendant").

Forsythe has not presented evidence of the claimed
difficulty of entering the nail polish market, nor has
Stubblefield presented evidence of the claimed ease of doing so.
At this stage, Stubblefield appears to contemplate at best a
minor or modest presence in the nail polish market by offering
"Rebel Debutante" nail polish in connection with a number of
related apparel products. Stubblefield's use of the mark is
relatively new, and thus it cannot be said that she will be
unable to "bridge the gap" into the nail polish market. The
proponent, however, must show that its intent to expand is
realistic, not merely wishful. <u>See</u> <u>U.S. Hosiery</u>, 707 F. Supp.
at 813 (characterizing party's likelihood to bridge the gap in

41

case before it as a wish rather than a reality). On the other hand, if Stubblefield was already entering the nail polish market in which Forsythe competes, this factor would not be relevant except as to indicate a greater likelihood of confusion as there would be no gap to be bridged. E.g., TCPIP Holding Co. v. Haar Commc'ns, 244 F.3d 88, 102 (2d Cir. 2001). Consequently, insofar as this factor seeks to preserve "likely" avenues of expansion for a mark holder and Stubblefield has demonstrated an intent to enter (though no present means to do so) the market, this factor slightly favors Stubblefield. The limited geographic market of Stubblefield's intent (discussions with a Winston-Salem retailer) further reduces the importance of this factor.

**Quality of Defendant's Product.** This factor is typically important in cases involving cheap copies and "knockoffs" of a competitor's trademark-protected goods. Sara Lee, 81 F.3d at 467. There is no evidence that Forsythe's nail polish products are of this nature, a point conceded by Stubblefield. (See Doc. 8 at 32.) This factor is neutral or slightly favors Forsythe.

**Sophistication of the Consuming Public.** "Barring an unusual case, buyer sophistication will only be a key factor when the relevant market is not the public at-large." Sara Lee, 81 F.3d at 467 (emphasis added); see Sara Lee Corp. v. Kayser-Roth Corp., Case No. 6:92CV00460, 1992 WL 436279, at *20

42

(M.D.N.C. Dec. 1, 1992) (noting buyers of pantyhose do not have any special sophistication). Although both parties allege that their products are aimed at sophisticated women, consumers of the products in question do not appear to have or need the sophistication contemplated by this factor. Thus, this factor is neutral.

**Conclusion.** Weighing all these factors, the court concludes that Plaintiffs have crossed the threshold (though barely) at this preliminary stage of demonstrating a likelihood of success with respect to showing a likelihood of confusion. Stubblefield owns, and Rebel Debutante licenses, a peculiar, distinctive, and conceptually-strong mark. Forsythe's use of that mark was on similar goods. Forsythe's claims of commercial weakness are tempered by the fact that Forsythe itself has modest sales of its "Color Club" product bearing the Plaintiffs' mark. Moreover, Forsythe's claim of different markets is also tempered by the fact that it only sells to independent retailers yet advertises on the Internet, as do Plaintiffs, and it chose the suggestive mark "Rebel Debutante" to appeal to its customer base. As to the nail polish market in particular, Plaintiffs have also demonstrated an intent to enter that market, and it is not clear on this record that "bridging the gap" to that market would be unduly difficult. At this preliminary stage, therefore, these factors are sufficient to forecast a likelihood

43

of confusion at this stage.    However, Plaintiffs will be required to demonstrate a stronger case, of course, once the merits are reached.

### 2.    Likelihood of Plaintiff Suffering Irreparable Harm

Stubblefield argues that an infringement itself gives rise to an irreparable injury and that the Fourth Circuit regularly grants preliminary injunctions in infringement cases without specifically addressing irreparable injury.    (Doc. 8 at 34.) Forsythe objects to any presumption of irreparable harm on the grounds that it no longer exists after the Supreme Court's decision in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006).    Moreover, even if the presumption were available, Forsythe contends, it has been rebutted by Stubblefield's six-month delay in bringing this action once she became aware of Forsythe's use of the term "Rebel Debutante" in its "Color Club" collection, as well as by her inability to demonstrate actual harm.

The Fourth Circuit has recognized, in the context of a Lanham Act trademark infringement case, that "a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion, the key element in an infringement case." Scotts Co. v. United Indus. Corp., 315 F.3d 264, 273 (4th Cir. 2002); see Lone Star, 43 F.3d at 938-39.    The

44

Fourth Circuit in Scotts, however, did not expressly adopt that presumption but noted that district courts in the Fourth Circuit had applied the test, 315 F.3d at 273 & n.3, and, since Scotts, those courts have continued to do so. The court is not persuaded that eBay alters the current law in this regard.

In eBay, the Supreme Court held in an action seeking a permanent injunction pursuant to the Patent Act, the traditional four-factor permanent injunction test applies. The Court stated that its decision was consistent with its prior rejection, under the Copyright Act, of invitations "to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." 547 U.S. at 391-94.[13]

eBay is distinguishable on several grounds. First, it involved a permanent, rather than preliminary, injunction. A preliminary injunction preserves the status quo at an early and incomplete stage of the litigation in anticipation of a decision on the merits. Second, there are distinctions between copyright and patent infringement actions, where monetary damages are often central, and trademark infringement, where confusion may have long-lasting effects. Third, several district courts in

_____

[13] The Supreme Court has held, of course, that a plaintiff seeking a *preliminary* injunction must show more than a mere "possibility" of irreparable harm by "demonstrat[ing] that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. 7, 129 S. Ct. at 375.

45

the Fourth Circuit continue to recognize the presumption in trademark cases after eBay, although often without citing the opinion. See, e.g., Meineke Car Care Ctrs., Inc. v. Catton, No. 3:10-CV-000234-RLV-DSC, 2010 WL 2572875, at *2 (W.D.N.C. June 24, 2010) (noting court in Lone Star "acknowledged that the 'irreparable injury necessary for injunctive relief regularly follows from trademark infringement'"); Lorillard Tobacco, 616 F. Supp. 2d at 587 (presumption of injury "generally applied" once plaintiff has shown a likelihood of confusion); Toolchex, Inc. v. Trainor, 634 F. Supp. 2d 586, 591 n.2 (E.D. Va. 2008). Indeed, in an opinion issued the year after eBay, National League of Junior Cotillions, Inc. v. Porter, No. 3:06-cv-508, 2007 WL 2316823, at *6 (W.D.N.C. Aug. 9, 2007), aff'd, 280 F. App'x 322 (4th Cir. 2008), the district court noted, with respect to trademark infringement, that "[b]ecause neither the Supreme Court nor the Fourth Circuit has explicitly extended eBay's reasoning to preliminary injunctions, and given the slight record in this case, the Court will not attempt to resolve eBay's impact at the preliminary injunction stage."

At this stage and in the absence of any indication from the Fourth Circuit to the contrary, the court will not discard the commonly-applied presumption of irreparable harm in preliminary injunction proceedings involving a trademark infringement

46

claim.[14]  As Stubblefield has forecast a likelihood of confusion,
the presumption applies.

Nor is the court persuaded that Stubblefield's six-month
delay in bringing this action prevents a finding of a likelihood
of irreparable harm.  It is true that "[s]ince an application
for preliminary injunction is based upon an urgent need for the
protection of [a] Plaintiff's rights, a long delay in seeking
relief indicates that speedy action is not required."  Quince
Orchard Valley Citizens Ass'n, Inc. v. Hodel, 872 F.2d 75, 80
(4th Cir. 1989).  Balanced against a delay in seeking injunctive
relief, however, is the goal of voluntary resolution of disputes
without the need for litigation.  E.g., Splitfish AG v. Bannco
Corp., 727 F. Supp. 2d 461, 468 (E.D. Va. 2010) (concluding
eight-month delay in case before court not unreasonable and, "to
the contrary, [plaintiffs] sought an efficient out-of-court
resolution") (copyright claim).

Here, the correspondence between the parties (e.g., Docs.
8-16 through 8-20) cannot be said to be unduly protracted.
Stubblefield's complaint alleges that her attorney wrote to

---

[14]    See, e.g., Jennifer L. Kovalcik, "Preliminary Injunctions in
Trademark Cases-Did eBay Change the Presumption of Irreparable Harm?",
Advanced Seminar on Trademark Law 2011, Patents, Copyrights,
Trademarks & Literary Property Course Handbook Series 1044 PLI/Pat 259
(May 2011) (available on Westlaw); Theodore H. Davis, Jr. & Jordan S.
Weinstein, United States Annual Review, 100 Trademark Rep. 88 (Jan.-
Feb. 2010); see also Thomas M. Williams, "Winter v. NRDC: A Stricter
Standard for Irreparable Harm in Trademark Cases?", 91 J. Pat. &
Trademark Off. Soc'y 571 (Oct./Nov./Dec. 2009).

Forsythe "[i]mmediately after Plaintiffs learned that Forsythe was infringing Plaintiffs' REBEL DEBUTANTE mark."[15] (Doc. 1, Compl. ¶ 33.) The delay, if any, was in Forsythe's failure to respond promptly. The law encourages conciliation efforts to avoid the expense and time of litigation, and Plaintiffs' delay is not unreasonable on the facts of this case.

Trademark infringement cases are concerned in large measure with the reputation of and goodwill toward the mark holder. In this case, Stubblefield's use of the "Rebel Debutante" mark in the commercial setting is relatively recent, and Plaintiffs' business activity is relatively small compared to Forsythe's longer history. There is a danger, however, that Forsythe's use of Stubblefield's peculiar mark may decrease her opportunity to develop goodwill and reputation if the public is confused as to the mark's ownership. Cf. Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc., 606 F. Supp. 2d 571, 585 (M.D.N.C. 2009) (discussing "reverse confusion" when defendant uses greater size and strength to overwhelm plaintiff's senior mark).

The court concludes that, based on this record, Stubblefield has demonstrated a likelihood of irreparable harm absent a preliminary injunction.

---

[15] The allegation is repeated in Stubblefield's brief (Doc. 8 at 9), but citing only the September 1, 2010, letter of Stubblefield's counsel to Forsythe (Doc. 8-16.).

### 3.    Balancing of Equities

Forsythe contends that it would suffer substantial harm if an injunction is entered against it, particularly with respect to any mandatory preliminary relief.    It also asserts that it has stopped selling the nail polish bearing Plaintiffs' mark and has removed all references to it from its website.[16]    (Doc. 44 at 2-3; Doc. 45, Rose Decl. ¶ 4.)    Stubblefield counters that any harm Forsythe might suffer would be self-inflicted and should be given little weight.    (Doc. 8 at 35.)

It is hard for Forsythe to contend it will suffer any appreciable harm if it is prohibited from marketing a product it contends it no longer intends to sell.    On the other hand, Plaintiffs risk a likelihood of irreparable harm if Forsythe were to continue using their mark, as noted above.    Therefore, Plaintiffs have demonstrated that the balance of equities tips in their favor as to prohibitory relief.    Because the court will deny Plaintiffs' request for a mandatory injunction, as noted infra, any balance of equities as to the award of mandatory relief is moot.

---

[16] It has been said that "[a] classical response to a defendant who argues that it has ceased the actions that plaintiff seeks to enjoin is: 'If you have irreversibly stopped those acts, then how can you be harmed by an injunction to not do what you say you promise you will not do again.'"    3 Thomas J. McCarthy, McCarthy on Trademarks and Unfair Competition § 30:11 (4th ed.) (citing Chisum LLC. v. Chief Auto. Sys., Inc., No. 01-816, 2001 WL 1640106 (D. Minn. 2001)).    Of course, no party should be preliminarily enjoined unless the requirements mandated by Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008), have been satisfied.

### 4. Public Interest

Stubblefield argues that the public interest is served by protecting her registered mark and preventing consumer confusion in the marketplace. (Doc. 8 at 34 (citing cases)). In contrast, Forsythe argues that the public interest favors denying the Motion, principally because a mandatory injunction would put a financial hardship on its continued operations and constitute "drastic relief" under the circumstances. (Doc. 44 at 19.)

There is a strong public interest in preventing trademark infringement. Indeed, the "purpose of a trademark is to protect the public from confusion about 'the identity of the enterprise from which goods and services are purchased.'" Toolchex, 634 F. Supp. 2d at 594 (quoting AMP Inc. v. Foy, 540 F.2d 1181, 1185-86 (4th Cir. 1976); see Merry Maids Ltd. P'ship v. Kamara, 33 F. Supp. 2d 443, 446 (D. Md. 1998) ("Preventing infringement . . . serves the public interest in preventing consumer confusion."). In light of the court's finding of a likelihood of success on the merits, including a likelihood of confusion if Forsythe re-engages in marketing its product using Plaintiffs' mark, the court concludes that a preliminary prohibitory injunction is in the public interest.

## C.  Request for Mandatory Preliminary Injunction

Plaintiffs seek a mandatory injunction that requires Forsythe to collect all product and marketing materials in the field that bear the "Rebel Debutante" mark.  At the hearing, Plaintiffs argued that because independent distributors may still have inventory, the court should also require Forsythe to notify them of the court's preliminary finding of the likelihood of success.  As noted above, Forsythe opposes a mandatory injunction as a "drastic remedy" and states that it has ceased production of its "Rebel Debutante" line of nail polish.

"Mandatory preliminary injunctions [generally] do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief.  That is to say, a mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind."  In re Microsoft Litig., 333 F.3d at 525 (quotation marks omitted) (citation omitted).  Forsythe's run of "Rebel Debutante" nail polish was of a few months duration, primarily over a year ago.  Although some "Rebel Debutante" nail polish may remain available at retail, the equities do not tip in Stubblefield's favor.  The situation is stable, not deteriorating, and the court will retain the ability

51

to enter ultimate relief on the merits without the assistance of a mandatory preliminary injunction. Stubblefield's request for a mandatory preliminary injunction is therefore denied.

### D. Security

Neither party has addressed the issue of an adequate bond in the event preliminary prohibitory relief is awarded. Because the court will enter only a prohibitory injunction, and because Forsythe represents that it does not intend to market any product bearing Plaintiffs' mark in the future, a nominal bond in the amount of $2,500 will be required at this stage.

## IV. CONCLUSION

For the foregoing reasons, the court finds that the action may continue in this forum and that Plaintiffs have made a clear showing for the entry of a prohibitory preliminary injunction to preserve the status quo.

IT IS THEREFORE ORDERED as follows:

1. The Motion to Transfer by Forsythe Cosmetic Group, Ltd. (Doc. 21) is DENIED;

2. Plaintiffs' Motion for Preliminary and Permanent Injunction (Doc. 7) is GRANTED IN PART AND DENIED IN PART;

3. Defendant Forsythe Cosmetic Group, Ltd., its officers, agents, servants, and employees, and any other person who is in active concert or participation with them, are enjoined preliminarily, pursuant to Federal Rule of Civil Procedure 65,

52

from any advertising, distribution, offering for sale, sale, or shipping of products using or associated with the mark "Rebel Debutante" until further order of the court; and

4. Pursuant to Federal Rule of Civil Procedure 65(c), this Preliminary Injunction shall become effective upon the posting by Plaintiffs of Two Thousand Five Hundred Dollars ($2,500) security with the Clerk of Court.

/s/ Thomas D. Schroeder
United States District Judge

July 1, 2011
Greensboro, North Carolina
4:20 p.m.